# **EXHIBIT A**

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS

COUNTY OF CHARLESTON ) NINTH JUDICIAL CIRCUIT

MICHAEL LUDWIG, ) Case No.:

Plaintiff,

v.                                      **SUMMONS**
                                        **(Jury Trial Requested)**

AMAZON.COM, INC., AMAZON.COM
SERVICES, LLC, AMAZON.COM
SALES, INC. and
SHENZHENSHIFANQIEPIKEJIYOUXI-
ANGONGSI d/b/a FIREME,

Defendants.

TO THE DEFENDANTS ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the Complaint herein, a copy

of which is herewith served upon you, and to serve a copy of your answer to this Complaint upon

the Plaintiff's attorneys, at the address shown below, within thirty (30) days after service hereof,

exclusive of the day of such service, and if you fail to answer the Complaint, judgment by default

will be rendered against you for the relief demanded in the Complaint.

Respectfully submitted this 18th day of March, 2025.

MORGAN, SLAUGHTER & HALTIWANGER, LLC

s/Charles T. Slaughter
Charles T. Slaughter, SC Bar No. 78689
1156 Bowman Rd., Suite 203
Mount Pleasant, South Carolina 29464
Telephone: (803) 359-6195
Facsimile: (803) 957-4584
chuck@mshfirm.com

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

S. Kirkpatrick Morgan, Jr.
Daniel S. Haltiwanger
135 East Main Street
Post Office Box 1256 (29071)
Lexington, South Carolina 29072
Telephone: (803) 359-6195
Facsimile: (803) 957-4584
kirk@mshfirm.com
dan@mshfirm.com
*ATTORNEYS FOR THE PLAINTIFF*

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF CHARLESTON | ) | NINTH JUDICIAL CIRCUIT |
| | ) | |
| MICHAEL LUDWIG, | ) | Case No.: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **(Jury Trial Requested)** |
| AMAZON.COM, INC., AMAZON.COM | ) | |
| SERVICES, LLC, AMAZON.COM | ) | |
| SALES, INC. and | ) | |
| SHENZHENSHIFANQIEPIKEJIYOUXI- | ) | |
| ANGONGSI d/b/a FIREME, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The Plaintiff, above named, complaining of the Defendants herein, would respectfully show unto this Court the following:

**PARTIES AND JURISDICTION**

1.     Plaintiff Michael Ludwig (hereinafter "Plaintiff") is a resident of Charleston County, South Carolina.

2.     Defendant Amazon.com, Inc. (hereinafter "Defendant Amazon.com" or "Amazon.com") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 410 Terry Avenue North, Seattle, Washington 98109.

3.     Defendant Amazon.com Sales, Inc. (hereinafter "Defendant Amazon Sales" or "Amazon Sales") is a Delaware corporation authorized to do business in the State of South Carolina with its principal place of business located at 410 Terry Avenue North, Seattle, Washington 98109.

4.     Defendant Amazon.com Services, LLC (hereinafter "Defendant Amazon Services" or "Amazon Services") is a Delaware limited liability company authorized to do business in the

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

State of South Carolina with its principal place of business located at 410 Terry Avenue North, Seattle, Washington 98109.

5.    Upon information and belief, Amazon.com, Amazon Sales, and Amazon Services (hereinafter collectively referred to as the "Amazon Defendants" or "Amazon") collectively own, manage, and oversee the operations of the online marketplace known as Amazon.com. In addition to facilitating third-party sales, Amazon is actively engaged in the business of designing, manufacturing, producing, assembling, importing, marketing, packaging, labeling, distributing, selling and/or otherwise placing into the stream of commerce various consumer products, including the product that forms the subject of this action.

6.    Shenzhenshifanqiepikejiyouxiangongsi d/b/a FIREME (hereinafter "Defendant FIREMEN" or "FIREME") is a company organized and existing under the laws of the People's Republic of China, with its principal place of business located at Room B501, Building B, No. B28, Taichung Industrial Zone, No. 7 Xinfeng Road, Ailian Community, Longcheng Subdistrict, Longgang District, Shenzhen, Guangdong 518000.

7.    Upon information and belief, Defendant FIREME is a registered seller on Amazon.com and is engaged in the business of designing, manufacturing, producing, assembling, importing, exporting, marketing, packaging, labeling, distributing, selling and/or otherwise placing into the stream of commerce various consumer products, including the product that forms the subject of this action.

8.    The Amazon Defendants and Defendant FIREME advertise, market, and sell their products to South Carolina consumers in a systematic and continuous manner with the specific intent for South Carolina consumers to purchase their products.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

9.    The Amazon Defendants and Defendant FIREME are sophisticated, commercial sellers of goods who regularly and systematically use their online and web-based platforms to advertise, market, and sell their products, including the product that forms the subject of this action, to individual buyers and consumers, including those located in South Carolina. This online activity was conducted knowingly and as part of a repeated, systematic sales effort whereby the Amazon Defendants and Defendant FIREME directed extensive online activity within South Carolina.

10.    The Amazon Defendants and Defendant FIREME have continuing contacts with South Carolina by transacting substantial business in this State and designing, manufacturing, marketing, advertising, importing, distributing, and selling their products with the reasonable expectation that they will be, and are in fact, used in this State.

11.    The Amazon Defendants and Defendant FIREME receive the benefits and protections of South Carolina laws by utilizing South Carolina ports to import their products into the United States and South Carolina, transporting their products on the roadways of South Carolina and warehousing products in South Carolina facilities funded in part by the taxpayers of South Carolina.

12.    The Amazon Defendants and Defendant FIREME have established continuous and systematic contacts with the State of South Carolina sufficient to confer general jurisdiction, which will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process

13.    This Court has subject-matter jurisdiction over the claims which are set forth herein, and venue is proper in this forum.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

## FACTUAL ALLEGATIONS

### A. *The Subject Product*

14.     At some time prior to May 20, 2025, Defendant FIREME, in concert with the Amazon Defendants in agency or otherwise, designed, manufactured, produced, exported, imported, assembled, marketed, distributed, sold and/or otherwise placed the subject "7501 & 7502 Hose and Regulator Kit for Weber Genesis Silver A&B, Genesis Gold B&Gold C, Grill Replacement Parts for Weber Spirit 200/300 Series GS4 Genesis II/II LX, Rogue & Prestige Series Gas Grills" (hereinafter the "subject hose and regulator kit" and the "subject product") into the stream of commerce.



15.     The subject hose and regulator kit is designed to connect a LP gas tank and a propane gas grill and contains a regulator, which is a device that controls and maintains uniform gas pressure as gas is released from the LP tank. The end that connects to the gas grill burner manifold contains a 3/8 inch brass hex nut fitting. The other end that connects to the LP gas tank is a standard QCC1 / Type 1 connector that contains a built-in safety feature that automatically shuts off the flow of gas if the connection is not properly tightened to the LP gas tank.

16.     On or about May 20, 2025, the Plaintiff purchased the subject hose and regulator kit from the Amazon Defendants (Order No. 112-2984708-2734628) as a replacement part for his Weber Spirt Gas Grill.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

17.     The subject hose and regulator kit was advertised by the Amazon Defendants as an appropriate replacement part for Weber Spirit Gas Grills. Given the size and reputation of Amazon as a trustworthy online marketplace, the Plaintiff believed the subject product was safe to use as warranted by Amazon's website. However, unbeknownst to the Plaintiff, the subject hose and regulator kit was defective and unreasonably dangerous at the time it was sold by the Amazon Defendants.

### B.     Amazon is a Seller for the purpose of S.C. Code Ann. § 15-73-10, et seq.

18.     Amazon provides an online marketplace through which it partners with sellers, like FIREME, to sell products to consumers through the U.S. To the consumer, like the Plaintiff, Amazon is the most critical part of the transaction, serving as the exclusive and sole means of marketing, communication, distribution, payment processing, returns and customer service contact.

19.     Amazon sells products on its website in two different modes. The first mode is that of a traditional products retailer where Amazon selects, buys, and sells the products to consumers at a price set by Amazon. The second mode is two-sided, whereby third-party sellers[1] utilize Amazon's website to sell their goods, while customers use Amazon to locate those vendors and purchase the third-party sellers' products.

20.     For a third-party seller to list its product on Amazon's website, the third-party seller must agree to the terms of Amazon's Services Business Solutions Agreement ("BSA"). FIREME and Amazon operate under the BSA.

---

[1] FIREME is a third-party seller that listed the Subject Product on Amazon. Where this document uses the phrase "third-party sellers" and/or "selling partners" it also specifically refers to FIREME and Amazon's requirements of FIREME to sell the Subject Product.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

21.    The BSA governs the relationship between Amazon and the third-party sellers and every step of the sales process. The BSA provides Amazon with tremendous control over all third-party seller transactions on its website from the third-party seller and consumer's perspectives.

22.    Under the BSA, Amazon reserves the right to control in its sole discretion the content, appearance, design, functionality and all other aspects of the product pages for selling partners' products.

23.    The BSA requires its selling partners to price products for Amazon users at least as favorably as any other sales channel, thereby advantaging sales through Amazon's marketplace.

24.    Sellers are required to pay a primary account fee just to list products on Amazon's platform. That fee is either a flat rate per-item sold or a monthly subscription fee. The other fee is a referral fee or commission which is calculated based on the sales price and Amazon's categorization of the type of product sold, which directly ties Amazon's compensation to every third-party sale.

25.    Under the BSA, Amazon has the exclusive right to receive all sales proceeds on the third-party seller's behalf. Third-party sellers are precluded from receiving or requesting payments directly from customers, and third-party sellers must only use the tools and methods Amazon provides to communicate with customers about Amazon transactions.

26.    Buyers, like the Plaintiff, satisfy their payment obligations to Amazon or its selling partners at the moment Amazon receives the sales proceeds.

27.    Under the BSA, the third-party seller's sales proceeds are held in Amazon's bank account, and Amazon may commingle the sales proceeds with funds from other third-party seller sales transactions, invest the funds, or use them for other legally permissible purposes.

28.    Amazon remits sales proceeds to sellers on a biweekly (or more frequent at Amazon's option) schedule after deducting Amazon's fees.

29.    Amazon does not require third-party sellers to use their corporate entity names on the product listing, and the third-party seller can specify what name will be listed as "Sold by" on the product listing. Third-party sellers' use of fictitious names makes it more difficult for the customers to determine the product's source. Moreover, Amazon does not provide contact information or a domestic address for FIREME for purchasers like the Plaintiff to address their product concerns.

30.    Amazon controls all communication between its customers and third-party sellers by requiring all communications to be held on Amazon's platforms (if Amazon does not choose to forego the third-party seller and communicate with the customer itself).

31.    Under the BSA, Amazon requires selling partners to maintain liability insurance naming Amazon as an additional insured for products sold on Amazon's marketplace.

32.    The BSA requires third-party sellers to release, indemnify, defend, and hold Amazon harmless for any claim, loss, damage, settlement, cost, expense, or other liability related to the third-party sellers' products sold through Amazon.

33.    Under the BSA, Amazon requires selling partners to ensure and certify that their products comply with any applicable laws and to notify Amazon of any public or private recall of their products.

34.    Under the BSA, Amazon has the power to require selling partners to provide Amazon with any product certification or product standards certification applicable to their products.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

35.     Amazon also independently monitors safety recalls and other safety issues related to products sold on its online marketplace. Amazon voluntarily undertakes to provide a number of safety-related services for the benefit of individuals who use products purchased through Amazon's website. Amazon's purported goal in offering these services has been to fully vet the safety and reliability of not just the products being sold on Amazon's website, but also the sellers whose products were being sold. Amazon's affirmative representations of reliability and its sales-enhancing services were in place long before the subject product was purchased by the Plaintiff, and they distinguished Amazon from other online marketplaces that acted as hands-off platforms, instead establishing that Amazon's self-chosen role was that of an active marketplace regulator. Amazon has held that role during all times relevant hereto.

36.     Amazon provides its customers with a warranty for all of the products sold on Amazon via its "A-to-Z Guarantee" for purchases made on its website.

37.     Amazon's A-to-Z Guarantee states, "We want you to buy with confidence anytime you make a purchase on the Amazon.com website or use Amazon Pay; that's why we guarantee purchases from third-party sellers when payment is made via the Amazon.com website… The condition of the item you buy and its timely delivery are guaranteed under the Amazon A-to-Z Guarantee."

38.     Amazon's A-to-Z Guarantee covers defective products sold by third-party sellers. If a customer encounters a problem, the customer is required to attempt to contact the third-party seller through Amazon. If the third-party seller does not respond, Amazon will refund the customer the product cost, original shipping costs, and the return costs. Amazon can require the third-party seller to reimburse Amazon for the refund costs.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

39.     Within Amazon's third-party seller mode of product sales, third-party sellers elect one of two product shipping or fulfillment options: (1) third-party sellers who fulfill orders themselves, which is called "Fulfilled by Merchant" ("FBM"), and (2) third-party sellers who use Amazon Fulfillment Services to accomplish the sale, which is called "Fulfilled by Amazon" ("FBA"). Upon information and belief, the subject product was part of the FBA program.[2]

40.     In Amazon's FBA program, Amazon takes physical possession of third-party sellers' products, stores the products in Amazon warehouses, packages the products in Amazon-labeled boxes, and ships the products directly to the Amazon customer.

41.     Amazon's FBA program allows third-party sellers to reach customers on a global basis. These customers include South Carolina citizens and residents, and specifically the Plaintiff.

42.     Amazon does not permit all products to be included in the FBA program. Third-party sellers must apply to register any product in the FBA program. Amazon may refuse product registration in the program for various reasons.

43.     In the FBA program, Amazon may ship a product offered by one third-party seller together with products offered by other third-party sellers or by Amazon itself.

44.     In the FBA program, Amazon controls the packaging for shipment, which may include Amazon branding and Amazon-specific messaging.

45.     Amazon handles all returns and customer service requests for FBA products. If a customer returns a product in the FBA program, the customer ships it back to Amazon, not the third-party seller. After Amazon receives a returned product, Amazon inspects the product and

---

[2] Upon information and belief, all of the FBA requirements and features discussed herein at least generally occurred with the sale of the subject product to the Plaintiff. Each allegation related to the FBA is applied to Amazon, FIREME, the subject product, and Plaintiff's transaction for the subject product.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

determines whether the product can be resold. If the product can be resold, Amazon will return the product to the third-party seller's inventory at the Amazon warehouse. If the product cannot be resold, the third-party seller can request to have the product sent back to the third-party seller, or Amazon destroys the product.

46.     In all Amazon transactions, but especially for products in the FBA program, Amazon owns and controls the relationship with the customer, and the seller does not. Third-party sellers have no direct relationship with the buyer. In most transactions, there is no communication between the third-party seller and the buyer. Here, Plaintiff never communicated with FIREME.

47.     Amazon does not contact the third-party seller for any purchase approval, and Amazon, in its sole discretion, determines whether to permit the transaction. The third-party sellers only know that one of their products has been sold after Amazon notifies them and/or the third-party seller receives the remittance from Amazon.

48.     Third-party sellers in the FBA program pay additional storage and fulfilment fees to Amazon beyond the general seller and referral fees paid by all third-party sellers. Amazon may also collect even more fees, such as fees for processing returns.

49.     Third-party sellers' products in the FBA program are designated as "Amazon Prime," which requires the third-party seller to (a) guarantee two-day delivery, (b) enter into a professional seller's agreement, and (c) satisfy certain performance metrics (primarily relating to properly managing orders and maintaining inventory levels).

50.     In the FBA program, when a third-party seller sends its product to one of Amazon's fulfillment centers, the third-party seller never touches the product again, and Amazon handles every other aspect of the transaction with the customer.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

51.    For FBA products, Amazon will provide inventory information to the third-party sellers indicating when the stock is low, like if the third-party seller were only a supplier.

52.    Amazon does not take legal "title" to any third-party sellers' products, but Amazon bears the risk of loss when the product is in its inventory, and Amazon has the right to destroy products that it deems, in its sole discretion, defective or unsafe. Therefore, Amazon retains constructive title to products stored in its fulfillment centers through its contractual power to withhold distribution, seize, resell, or destroy inventory.

53.    For products in the FBA program, Amazon has the "right to substitute" the products it sells to consumers. Amazon stores products in its inventory on a product-by-product basis, not a seller-by-seller basis. Multiple third-party sellers may send Amazon the exact same product, and when Amazon fulfils a customer's order, Amazon will grab the product from a bin without regard to which third-party seller provided that particular product. In other words, the customer may think they are buying the particular product from one seller, but the customer may actually get the product from a different seller.

54.    Amazon never tells the customers about the right to substitution. If the same product is provided by multiple third-party sellers, the customer may never know which third-party seller actually provided the particular product.

55.    Like brick-and-mortar stores that select product placement on their shelves (e.g., placing a certain product at eye-level), Amazon utilizes preferential product placement on Amazon's website. Amazon's website places certain products in more favorable positions to influence what Amazon customers see on the website. Amazon places certain products in more favorable positions on its website in a way that maximizes profit for Amazon.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

56.     Certain Amazon products are labeled as "Sponsored," and those products receive more favorable placement on Amazon's website. Amazon sets a certain number of products that may receive the "Sponsored" label, and third-party sellers bid for their products to receive the label. The "Sponsored" label has nothing to do with Amazon's opinion of product quality or product safety, and the label is solely based on third-party sellers' payment for the label. The Amazon customer is never informed (at least conspicuously or without the customer digging for what the label means) that the "Sponsored" label is only derived from the third-party sellers' payment for such labeling and that the label has nothing to do with Amazon's opinion on the product's quality or safety.

57.     With the "Sponsored" label, Amazon influences what products Amazon's customers will see, which ultimately influences every Amazon transaction. Amazon controls both the Amazon customer and the third-party sellers through this "Sponsored" label through the third-party seller's payment for such label, and the customer sees the product in a more favorable placement on Amazon's website.

58.     Amazon also controls preferential product placement through "Keyword Bids," where third-party sellers bid for specific keywords for their products when customers search those words on Amazon's website. Again, the third-party seller bids for such, and Amazon makes a profit from the Keyword Bids.

59.     Amazon also designates some products as "Amazon Choice." Amazon considers sales price, feedback score, and quantity sold when determining whether to designate a product as "Amazon Choice." This designation is provided solely at Amazon's discretion, and this designation gives Amazon significant control over the third-party seller.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

60.     Amazon also awards some products by labeling them as "Best Sellers." The "Best Seller" label is determined through an Amazon algorithm that weighs certain metrics.

61.     Whether by direct payment or by Amazon's algorithm, Amazon controls every third-party seller's product placement on Amazon's website.

62.     While Amazon's preferential product placement and labels have nothing to do with the quality or safety of a product, the labeling and placement influence Amazon customers' purchasing decisions (like placing a product on a shelf at eye-level in a brick-and-mortar store) and leads Amazon customers to believe that Amazon is endorsing a product's quality and safety.

63.     Through Amazon's preferential product placement and labeling, Amazon controls every sale on its website.

64.     Amazon and FIREME sold the subject product in a defective condition unreasonably dangerous to the user or consumer (and specifically, the Plaintiff), and are subject to strict liability for damages under S.C. Code § 15-73-10, et seq.

65.     Amazon and FIREME are sellers that are engaged in the business of selling the subject product as contemplated by South Carolina law.

66.     Amazon played an integral role in placing the subject product in the stream of commerce, which ultimately led to Plaintiff's purchase of the product from Amazon.

67.     Plaintiff never had any communication or contact with FIREME to purchase the subject product or otherwise. Instead, Plaintiff solely interacted with Amazon to purchase the subject product.

68.     Amazon exercised extensive control over the subject product, FIREME, the Plaintiff, and this transaction through the BSA.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

69.     Amazon's role in every transaction between third-party sellers and customers is functionally equivalent to a brick-and-mortar retailer, and retailers have long been held liable under product liability causes of action in South Carolina.

70.     Although Amazon never takes title to any third-party seller products, which Amazon will claim precludes it from being held liable as a "seller in the business of selling," South Carolina does not strictly apply the terms "sells" and "seller." South Carolina recognizes that the terms "sells" and "seller" are merely descriptive, and the doctrine of strict product liability may be applied if the requirements for its application are otherwise met.

71.     Amazon placed the subject product into the stream of commerce and received a monetary benefit for doing so, and Amazon played an integral role in the marketing enterprise and the chain of product distribution such that Amazon may be held liable under product liability causes of action.

72.     Amazon is a service provider only with respect to the third-party sellers. Amazon is a seller engaged in the business of selling with respect to its customers.

73.     The justifications for holding non-manufacturing defendants such as distributors, dealers, retailers, assemblers, and marketers, etc., liable under products liability causes of action apply in equal force for Amazon, which exercises tremendous control over all sales on its website:

    (a)    The public has a right to expect that a reputable seller will stand behind his goods, and the burden of accidental injuries is properly placed upon those who market the defective product;

    (b)    Amazon's position in the marketing chain allows it to exert pressure on the manufacturer and third-party sellers of products to enhance the safety of its products;

    (c)    Amazon, like conventional retailers, may be the only member of the distribution chain reasonably available to an injured plaintiff who purchases a product on its website. Amazon enables foreign manufacturers and sellers with little presence in the United States to sell products here, and Amazon specifically facilitates those

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

sales without regard to whether the third-party sellers can be brought into court in the United States, can be served, fail to appear, or are judgment-proof. Imposing strict liability on Amazon helps compensate injured plaintiffs who would otherwise go uncompensated, and it would incentivize Amazon to ensure the third-party seller's availability for suit in the United States;

(d) Extending liability to entities farther down the commercial stream from the manufacturer promotes the policy of compensating injured plaintiffs, and retailers may seek indemnity. Likewise, Amazon requires all third-party sellers to indemnify it for any injuries caused by defective products, and Amazon requires certain third-party sellers to obtain liability insurance on Amazon's behalf;

(e) Amazon, like conventional retailers, may play a substantial part in ensuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end, and strict liability incentivizes product safety. In fact, Amazon does (or at least claims to) exert influence on third-party sellers to enhance safety through the BSA and FBA as discussed above;

(f) Amazon, like conventional retailers, can require and enforce product safety standards before selling a product. While Amazon can and does require that some products meet safety standards, it does little to verify and enforce any safety standard requirements. Strict product liability incentivizes Amazon to ensure product compliance with applicable safety standards;

(g) Amazon also represents, at the very least implicitly, that the products sold on its website are safe, and Amazon's customers, including Plaintiff, have an expectation of safety in its products, which Amazon encourages;

(h) The doctrine of strict liability is intended to cut through technicalities and compensate plaintiffs for injuries caused by defective products;

(i) Amazon has a continuing relationship with third-party sellers, and it exercises significant control over the transactions on its website, which allows Amazon to exert pressure on sellers to enhance product safety, making it more akin to a retailer than an auctioneer;

(j) Amazon, like a conventional retailer, may only have an ongoing relationship with the third-party sellers (or a distributor in the retailer's case), but Amazon can exert pressure on manufacturers indirectly through the third-party sellers;

(k) Amazon, like a conventional retailer, receives an enormous economic benefit from the third-party sellers' products that it sells;

(l) Amazon, like conventional retailers, is far better suited to prevent defective products from causing injury by refusing to sell defective products; and

(m) Amazon is uniquely positioned to receive reports of defective products via customer complaints and communication, which could prevent defective products from being circulated because Amazon can remove such products from its website. On the other hand, third-party sellers are not well equipped to perform this function because Amazon controls all methods of communication with the customer.

74. Amazon is responsible and can be held liable for its own negligence because Amazon knew, or should have known, that the subject product was unreasonably dangerous, and Amazon failed to use reasonable care in selling the subject product to the Plaintiff, in failing to warn about the dangers of the subject product before and after the sale, and in failing to discontinue the sale of the subject product and other similar products.

75. Amazon is the third-party sellers' agent (actual or apparent) for all third-party sellers throughout the sales process such that Amazon may be held liable for the sale of defective products under agency law.

76. Amazon is FIREME's apparent agent for the transaction for the subject product in the following ways:

(a) Amazon held themselves out as having FIREME's permission to conduct the sale of the subject product;

(b) Amazon held themselves out as having FIREME's permission to accept payment for the subject product;

(c) Amazon held themselves out as having FIREME's permission to facilitate the subject product's timely and prompt shipment;

(d) Upon information and belief, Plaintiff relied on Amazon to have FIREME's permission to conduct the sale, collect and process payment, and control the transaction;

(e) Upon information and belief, Plaintiff relied on Amazon's "A-to-Z Guarantee" such that it was reasonable to assume Amazon was responsible for any issues with the subject product; and

(f) Upon information and belief, Plaintiff relied on Amazon, as the world's largest seller of consumer products, to provide safe products.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

77.    Amazon is registered in South Carolina as a retailer under the Sales and Use Tax Act.

78.    The South Carolina Court of Appeals has held that Amazon is engaged in the business of selling tangible personal property at retail for the purpose of state income tax for its sales of third-party sellers' products. Amazon Services, LLC v. S.C. Dept. of Rev., 442 S.C. 313, 898 S.E.2d 194 (Ct. App. 2024).

79.    All of Plaintiff's claims against Amazon rely on allegations relating to selling, inspecting, marketing, designing, distributing, importing, failing to test, injecting into the stream of commerce, and failing to warn, which all pertain to Amazon's direct role in the sales and distribution processes. Plaintiff's claims do not pertain to Amazon's editorial function of its website, or its actions as a publisher or speaker of information provided by another content provider.

## C.    The Subject Incident

80.    Plaintiff purchased the subject product from the Amazon Defendants via Amazon's website on May 20, 2025.

81.    Amazon processed the Plaintiff's credit card payment and then notified FIREME of the Plaintiff's order and required FIREME to provide Amazon with the shipping information for the product.

82.    The Plaintiff received purchase confirmation emails from Amazon regarding the transaction.

83.    The Plaintiff received shipping confirmation emails from Amazon regarding the shipment of the product.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

84.     On or about May 22, 2025, Amazon delivered the subject hose and regulator kit to Plaintiff's home in Charleston County, South Carolina in an Amazon package.

85.     After connecting the subject regulator and hose assembly to his Weber Spirt Gas Grill and AmeriGas LP gas tank, the Plaintiff leak tested the regulator and hose connections and found no leaks.

86.     Between May 22, 2025 and May 28, 2025, the Plaintiff used his Weber gas grill with the subject hose and regulator kit connected thereto on two occasions without incident.

87.     On the evening of May 29, 2025, the Plaintiff was using his Weber grill to cook dinner for his family. After turning the LP tank on, the Plaintiff pressed the igniter button on the grill and immediately began to hear a hissing noise coming from the inside of the lower cabinet of the grill where the LP tank and the subject hose and regulator kit are located. While sitting in a chair in front of the grill, the Plaintiff attempted to open the grill cabinet door to turn off the LP gas tank when, suddenly and without warning, a flash fire occurred.

88.     As a direct and proximate result of the aforementioned, the Plaintiff sustained severe personal injuries including, but not limited to, second burns to approximately two percent (2%) of his total body surface area including his left upper extremity, face and bilateral lower extremities, which have caused and will in the future cause him to endure great physical pain, suffering, loss of enjoyment of life, severe and indefinite scarring, mental anguish, emotional distress, physical impairment, permanent disfigurement, and loss of wages and earning capacity, and which have caused and will continue to cause the Plaintiff to incur expenses for medical services.

89.     The aforementioned flash fire that originated inside of the lower cabinet of the Plaintiff's Weber grill was caused by the ignition of LP gas that was leaking from the subject hose

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

and regulator kit due to design and/or manufacturing defects with the product that existed at the time the subject product was designed, manufactured and sold by the Amazon Defendants and FIREME (hereinafter collectively referred to as the "Defendants").

<u>**FOR A FIRST CAUSE OF ACTION**</u>
*(Strict Products Liability / S.C. Code Ann. §15-73-10 as to All Defendants)*

90.     Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

91.     The Defendants are, and at all times relevant hereto were, engaged in the business of designing, manufacturing, importing, marketing, distributing, supplying and/or selling various consumer products, including the subject hose and regulator kit, to consumers within the stream of commerce. Therefore, the Defendants are sellers of the subject hose and regulator kit as that term is defined in S.C. Code Ann. § 15-73-10 *et seq*.

92.     The subject hose and regulator kit was expected to, and did, reach the user and/or consumer without substantial change in the condition in which it was sold, and unexpectedly failed under ordinary and foreseeable use.

93.     At the time the subject hose and regulator kit was designed, marketed, distributed, and sold by the Defendants, it was in a defective condition unreasonably dangerous to users and consumers, including the Plaintiff, who was an intended and/or reasonably foreseeable user.

94.     The subject hose and regulator kit was unreasonably dangerous and defective in that its design and construction allows LP gas to leak from the hose and regulator assembly after the regulator is connected to a LP gas tank.

95.     At the time the subject hose and regulator kit left the Defendant's control, and at all times complained of, safer alternative designs were available that would have eliminated the risk

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

of the subject hose and regulator assembly leaking LP gas after the regulator is connected to a LP gas tank without substantially impairing the usefulness and intended purpose of the product.

96.     The subject hose and regulator kit was also defective and unreasonably dangerous in that contained one or more latent manufacturing defects that allowed LP gas to leak from the hose and regulator assembly after the regulator is connected to a LP gas tank.

97.     The subject hose and regulator kit was further defective and unreasonably dangerous in that it did not contain adequate warnings regarding the use of the product.

98.     At the time the subject hose and regulator kit was designed, marketed, distributed, and sold, the Defendants knew or in light of reasonably available knowledge should have known about the dangers posed by the subject hose and regulator assembly leaking LP gas after the regulator is connected to a LP gas tank, and that the ordinary user or consumer would not realize this dangerous condition. Furthermore, the Defendants were aware of alternative warning options that would have allowed users such as the Plaintiff to use the subject hose and regulator kit safely.

99.     At all times relevant hereto, the subject hose and regulator kit was being used in a foreseeable manner and for its intended purpose and the Plaintiff was unaware of any of the aforementioned defects.

100.    The defective and unreasonably dangerous condition of the subject hose and regulator kit was the direct and sole proximate cause of the Plaintiff's injuries and damages which include, but are not limited to, past, present and future medical expenses, loss of wages and/or loss of wage earning capacity, pain and suffering, permanent disability, scarring and disfigurement, mental anguish and emotional distress.

101.    Based on the foregoing, pursuant to S.C. Code Ann. § 15-73-10, the Defendants are strictly liable for the injuries and damages, both actual and punitive, sustained by the Plaintiff.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

**FOR A SECOND CAUSE OF ACTION**
*(Negligence as to All Defendants)*

102.    Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

103.    The Defendants owed consumers and/or foreseeable users, including the Plaintiff, the duty of reasonable care in their design, manufacture, assembly, marketing, distribution and sale of the subject hose and regulator kit.

104.    At all times relevant hereto, the Plaintiff exercised due and reasonable care for his own safety and was using the subject hose and regulator kit in a manner and for the purpose for which it was intended.

105.    The Defendants were negligent, grossly negligent, reckless, willful and wanton, and breached the duties owed to the Plaintiff in one or more of the following particulars, to wit:

(a)    In designing and manufacturing the subject hose and regulator kit in such a way that it was unfit and unsafe for its intended use;

(b)    In failing to ensure the subject hose and regulator kit met applicable industry standards and codes;

(c)    In placing the subject hose and regulator kit into the stream of commerce when they knew, or should have known, it was unreasonably dangerous and unsafe for its intended use;

(d)    In placing into the stream of commerce a product, namely the subject hose and regulator kit, that was defective in design in that it allows LP gas to leak from the hose and regulator assembly after the regulator is connected to a LP gas tank.

(e)    In failing to implement safer, technologically feasible, and economically practical design alternatives or processes for the subject hose and regulator kit;

(f)    The Defendants knew or should have known of feasible alternative designs that would have significantly reduced and/or eliminated the risks posed by the subject hose and regulator assembly leaking LP gas after the regulator is connected to a LP gas tank and failed to employ said design alternatives to make it safe for its foreseeable environment;

(g)     In manufacturing the subject product in such a way that it allows LP gas to leak from the hose and regulator assembly after the regulator is connected to a LP gas tank;

(h)     In failing to exercise reasonable care in testing and inspecting the subject hose and regulator kit before making it available for sale;

(i)     In failing to protect foreseeable users of the subject hose and regulator kit from the dangers present in the use of such product, which dangers the Defendants knew or should have known existed;

(j)     The subject hose and regulator kit, as sold, posed a risk of unreasonable harm to users beyond that understood or contemplated by the average reasonable consumer, and the risks associated with its design outweighed its utility;

(k)     In placing into the stream of commerce a product, namely the subject hose and regulator kit, that was defective in that it failed to contain adequate warnings and instructions;

(l)     In failing to adequately instruct and/or adequately warn users and consumers, including the Plaintiff, of the dangerous propensities in the design of the subject hose and regulator kit, and of the safe and proper method of use of the subject hose and regulator kit;

(m)     In failing to exercise that degree of due care which a reasonably prudent designer, manufacturer, distributor and seller would have exercised under the same or similar circumstances; and

(n)     In being otherwise negligent, grossly negligent, reckless, willful, and wanton as will be revealed through discovery.

All of which combined and concurred as a direct and proximate cause of the injuries and damages sustained by the Plaintiff herein, said acts and/or omissions being in violation of the statutory and common law of the State of South Carolina and the dictates of ordinary prudence.

106.    The aforesaid negligent, grossly negligent, willful, wanton, reckless, and unlawful acts and/or omissions of the Defendants were the direct and sole proximate cause of the Plaintiff's injuries and damages which include, but are not limited to, past, present and future medical expenses, loss of wages and/or loss of wage earning capacity, pain and suffering, permanent

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

disability, scarring and disfigurement, mental anguish, emotional distress and loss of enjoyment of life.

## FOR A THIRD CAUSE OF ACTION
### *(Breach of Express and Implied Warranties as to All Defendants)*

107.     Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

108.     Prior to and at the time of sale, the Defendants expressly and impliedly warranted that the subject hose and regulator kit was of merchantable quality and reasonably fit for the particular purposes for which it was intended to be used, and that it was safe for such use.

109.     The Plaintiff made ordinary use of the subject hose and regulator kit in reliance on said warranties.

110.     Contrary to said warranties, the subject hose and regulator kit was defective and unfit for its ordinary and foreseeable purposes, rendering it unreasonably dangerous.

111.     By reason of and as a direct and proximate consequence of the Defendants' breach of express and implied warranties, the Plaintiff suffered the injuries and damages as set forth herein, for which the Defendants are liable.

## FOR A FOURTH CAUSE OF ACTION
### *(Negligent Undertaking as to The Amazon Defendants)*

112.     Plaintiff incorporates by reference all preceding paragraphs and allegations of this Complaint as though fully set forth herein.

113.     At all times relevant hereto, the Amazon Defendants had voluntarily undertaken to thoroughly vet the safety and reliability of: 1) all sellers who were listing products on Amazon's website and 2) all products being sold on Amazon's website. Amazon had also voluntarily undertaken to thoroughly investigate all reports of dangerous products on its website, and to protect

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

individuals who used products purchased through Amazon by notifying them of unsafe products. These services were undertaken by Amazon for the benefit of all individuals who used products that had been purchased through Amazon's website.

114.    The subject hose and regulator kit was a product being sold on Amazon's website, and Amazon had voluntarily undertaken to fully vet the safety and reliability of that product before it was listed on Amazon's website.

115.    The Amazon Defendants acted as a gatekeeper to keep its customers safe and can exert pressure on upstream suppliers and agents to enhance safety. Having accepted the role and undertaking of looking out for consumer safety, the Amazon Defendants owed a duty to exercise reasonable care to protect that undertaking. Consumers have come to expect that they can buy safe products from the Amazon Defendants including on any Amazon platform.

116.    Although Amazon knew or should have known the above-described safety-related services were necessary for consumer's, including the Plaintiff's, protection, it failed to exercise reasonable care in performing those services, thereby violating the above duties. Specifically, Amazon:

   (a)    failed to properly vet Defendant FIREME;

   (b)    failed to properly vet the subject hose and regulator kit;

   (c)    exposed and introduced the Plaintiff to a dangerous product by recruiting Defendant FIREME to sell on Amazon;

   (d)    failed to ensure that the subject hose and regulator kit met minimum standards for the industry;

   (e)    exposed and introduced the Plaintiff to a dangerous product by allowing the subject hose and regulator kit to be listed on Amazon's website;

   (f)    failed to warn consumers, including the Plaintiff, about the unreasonably dangerous latent condition of the subject hose and regulator kit of which Amazon was aware or should have been aware of.

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427

117.    The Plaintiff relied upon the Amazon Defendants to perform the above-described safety-related services because the Plaintiff would not have purchased the subject hose and regulator kit through Amazon if he had known Amazon was not the safe and reliable marketplace it held itself out to be. The Plaintiff  purchased the subject hose and regulator kit because he believed it would be more reliable than other similar products because it was sold on Amazon's website. Amazon warranted and promoted the subject hose and regulator kit as being safe and lulled the Plaintiff, who was unaware it was coming from an unreliable Chinese manufacturer, into a false sense of security. The Plaintiff trusted that Amazon had confirmed the reliability of Defendant FIREME and the safety of the subject hose and regulator kit when he purchased the product.

118.    Additionally, Amazon's failure to properly vet the safety and reliability of Defendant FIREME and the subject hose and regulator kit and failure to properly investigate and warn about the dangerous latent condition of the subject hose and regulator kit significantly increased the Plaintiff's risk of harm because the Plaintiff would never have come across the subject hose and regulator kit and purchased it but for its being listed and promoted as a safe product on Amazon's website. The Plaintiff also would never have come across Defendant FIREME at all but for Amazon's active provision of logistical assistance to and recruitment of Defendant FIREME. Similarly, the Plaintiff would not have used the subject hose and regulator kit on the day of the incident if he had been alerted to the subject hose and regulator kit's danger by Amazon.

119.    The aforesaid negligent, grossly negligent, willful, wanton, reckless, and unlawful acts and/or omissions of the Defendants were the direct and sole proximate cause of the Plaintiff's injuries and damages which include, but are not limited to, past, present and future medical

expenses, loss of wages and/or loss of wage earning capacity, pain and suffering, permanent disability, scarring and disfigurement, mental anguish, emotional distress and loss of enjoyment of life.

WHEREFORE, having fully set forth his Complaint above, the Plaintiff prays for judgment against the Defendants, jointly and severally, for a sum of actual and punitive damages found to be fair, just, and proper; for the costs of this action; and for such other and further relief as this Court may deem just and proper.

Respectfully submitted this 18th day of March, 2026.

MORGAN, SLAUGHTER & HALTIWANGER, LLC

s/Charles T. Slaughter
Charles T. Slaughter, SC Bar No. 78689
1156 Bowman Rd., Suite 203
Mount Pleasant, South Carolina 29464
Telephone: (803) 359-6195
Facsimile: (803) 957-4584
chuck@mshfirm.com

S. Kirkpatrick Morgan, Jr.
Daniel S. Haltiwanger
135 East Main Street
Post Office Box 1256 (29071)
Lexington, South Carolina 29072
Telephone: (803) 359-6195
Facsimile: (803) 957-4584
kirk@mshfirm.com
dan@mshfirm.com
*ATTORNEYS FOR THE PLAINTIFF*

ELECTRONICALLY FILED - 2026 Mar 18 3:52 PM - CHARLESTON - COMMON PLEAS - CASE#2026CP1001427